**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL SCIORE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No.: 20-cv-6035** |
| | : | |
| **CENTRIC BANK,** | : | |
| **Defendant.** | : | |

**<u>MEMORANDUM</u>**

**SITARSKI, M.J.**                                              **December 20, 2022**

Presently pending before the Court are Defendant's Motion for Summary Judgment (Mot. for Summ. J., ECF No. 43), Plaintiff's response thereto (Resp., ECF No. 49), Defendant's reply memorandum (Reply Mem., ECF No. 52), Defendant's Supplemental Memorandum Pursuant to the Court's September 28, 2022 Order (Def.'s Suppl. Mem., ECF No. 59), Plaintiff's Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment (Pl.'s Suppl. Br., ECF No. 60), Plaintiff's Responsive Brief in Opposition to Defendant's Supplemental Memorandum (Pl,'s Responsive Br, ECF No. 61), and Defendant's Supplemental Responsive Brief to Plaintiff's Brief Pursuant to the Court's September 28, 2022 Order (Def.'s Suppl. Responsive Br., ECF No. 62). For the reasons that follow, the Motion for Summary Judgment is **GRANTED.**

I.      **FACTS**[1]

According to the Verified Complaint, this matter arises out of a long-standing relationship between Plaintiff Michael Sciore and Defendant Centric Bank ("the Bank"). Sciore

---

[1] As required at this stage of the proceedings, the Court views the evidence in the light most favorable to Plaintiff as the non-moving party. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

avers that he provided substantial services to the Bank for which he has not been compensated:

> Over many years, Plaintiff, via various entities he owned and controlled, entered into several loan transactions with the Bank and developed close personal and business relationships with the Bank's President and other members of Bank leadership. As part of this rapport, and at the Bank's request, Mr. Sciore provided substantial assistance to the Bank with development of the Bank's residential mortgage division and recruitment of skilled professionals to staff same. Mr. Sciore reasonably believed, based upon his close relationships at the Bank, that, by rendering such assistance, his relationship with the Bank would be strengthened and that the Bank would compensate him in the form of referrals and additional lucrative business opportunities. Instead, after the Bank obtained the benefit of Mr. Sciore's guidance and expertise, they failed to provide any compensation for these valuable services.

(Notice of Removal, ECF No. 1-15, Ex. L at ¶ 1).

Plaintiff Michael Sciore has extensive experience in the "mortgage space," including the ownership and operation of a large-scale mortgage company from 2002 through 2012. (*Id.* at ¶ 9). In 2010 or 2011, he co-founded America's Mortgage Institute ("AMI"), which trained loan officers and then placed them with mortgage companies after completing their training. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 38:11-15, 39:11-15). AMI's courses were "developed as [if] you've never seen the business before." (*Id.* at 54:5-7). Although rudimentary, the training program could be used by existing businesses and as a refresher. (*Id.* at 52:1-24, 53:9-22, 54:7-10, 56:1-6). AMI closed in 2017 or 2018. (*Id.* at 56:22-57:1, 170:22-171:3).

Sciore knew as of November 10, 2014 that the Bank had an existing residential mortgage division. (*Id.* at 76:16-77:11). He learned about this division from Don Bonafede, a commercial loan officer with the Bank who had helped Sciore secure several commercial loans for AMI. (*Id.*; Resp., ECF No. 49-6, Sciore Decl. at ¶¶ 5-7). Sciore also spoke with Terrence Monteverde, the Bank's chief credit officer, to review issues with the Bank's mortgage department. (Resp., ECF No. 49-6, Sciore Decl. at ¶ 8). It was Bonafede who first approached Sciore to ask for help with "Defendant's early-state mortgage department," which was losing money. (*Id.* at ¶¶ 5-6).

Both Bonafede and Monteverde had an existing relationship with Sciore "during their time at Mid Penn Bank." (*Id.* at ¶ 9). Bonafede was aware of Sciore's extensive experience in the mortgage industry and told Sciore that the Bank could use his help. (*Id.* at ¶ 6). Sciore averred that, "[d]uring the Fall of 2014, I had many calls and [an] in-person meeting with Mr. Bonafede about giving Defendant business from my own commercial ventures and my personal properties along with engaging with Defendant's Chief Executive Officer, Patricia Husic, to help her build a more profitable mortgage department." (*Id.* at ¶ 7). "Mr. Bonafede, Mr. Monteverde, and eventually Ms. Husic, all assured me that by assisting Defendant with its residential mortgage department, and providing them with my services, I would be compensated through, inter alia, referrals, additional lucrative opportunities, and my loans would be given top priority at Centric Bank." (*Id.* at ¶ 10). In fact, Monteverde told him that Husic did not know how to make the mortgage department profitable and that the Bank's board was eager to enter the residential mortgage market. (*Id.* at ¶ 11).

It appears that Sciore first began communicating with CEO Husic in November 2014. (*Id.* at ¶¶ 12-13; Resp., ECF No. 49-7, Ex A). In April 2015, there was an e-mail discussion about scheduling a meeting between Sciore and Husic regarding the AMI software product, but Sciore indicated at his deposition that there were also earlier discussions on this matter. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 110:3-24). He gave the Bank a free version of his AMI online software program in August 2015. (*Id.* at 110:3-111:10). On January 27, 2016, he told Bonafede and Husic that "I'm also arranging with my AMI staff to give Centric full access to the AMI education and training program when ready" because "[y]ou helped me with PA Bankers, so this is a simple thank you gift." (Answer, ECF No. 3-2, Ex. B at 2). According to Sciore's deposition testimony, "[t]he AMI program was a gift." (Mot. for Summ. J., ECF No. 43-13, Ex. H at 181:9-12). The program was installed on the Bank's network on or about February 12,

2016.  (*Id.* at 136:7-10; ECF No. 43-18, Ex. M).

On January 27, 2016, Bonafede e-mailed Husic stating that he had spoken with Sciore about "our earlier discussion," Sciore was more than happy to work with the Bank "to develop a finely tuned machine for our residential mortgage department," and she should feel free to contact Sciore at her convenience.  (Mot. for Summ. J., ECF No. 43-16, Ex K at 2).  On February 5, 2016, the Bank provided Sciore with a "layout" of the mortgage division.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 129:1-7; ECF No. 43-17 Ex. L).

Husic asked Sciore to find and recruit loan officers because the Bank's current personnel were not meeting expectations.  (Resp., ECF No. 47-6, Sciore Decl. at ¶ 15).  She was concerned that the mortgage department was not profitable, and Sciore explained to her that a "pricing engine" was necessary for the Bank's mortgage department's success because it would allow the Bank to price out different loan options to potential borrowers.  (*Id.* at ¶ 17).  Together they reviewed the benefits of such an engine, including the pull through ratios and data storage advantages.  (*Id.*).  In his declaration, Sciore stated that "Ms. Husic had informed me that if I helped picked the right pricing engine and worked with her senior vice president, Leslie Meck, in implementing and installing the system, I would receive a .15 basis point on all revenue (on a monthly basis) produced by Defendant in form of fees as a consultant and recruiter."  (*Id.* at ¶ 18).  He further explained that "Ms. Husic wanted to wait approximately 12-18 months to see the success of the pricing engine before I would receive compensation."  (*Id.*).  Sciore (together with his employee Mark Furey) worked to find the best pricing engine.  (*Id.* at ¶ 18; Resp., ECF No. 49-9, Ex. C).  The Bank ultimately chose and continues to use Optimal Blue—the pricing engine recommended by Sciore.  (Resp., ECF No. 49-6, Sciore Decl. at ¶ 20; ECF No. 49-10, Ex. D).  Husic expressed her appreciation for the work he had done on the selection of the pricing engine, telling him that the Bank's employees did not have the foresight or ability to consider using such

4

a system.  (Resp., ECF No. 49-6, Sciore Decl. at ¶ 21).

"Plaintiff contends that he recruited three (3) loan officers:  Joseph Bell, Anthony Panto, and Christopher Bickel to work for the Bank, and that the Bank's hiring and retention of these three (3) individuals (defined by Plaintiff in his Complaint as 'the Recruited Individuals') 'was a further benefit to the Bank's growing residential mortgage division.'"  (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 13) (quoting Notice of Removal, ECF No. 1-15, Ex. L at ¶¶ 22, 30).  According to his declaration, Sciore spent considerable time and energy recruiting the three men, who were chosen because of how they would fit into the Bank's culture and their ability to use the new pricing engine.  (Resp., ECF No. 49-6, Sciore Decl. at ¶¶ 22-23).

Sciore, who had employed Bell at Precision Funding Group, had initial in-person meetings and phone conversations with Bell at some point in 2016.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 200:1-19, 203:1-3).  He forwarded Bell's resume to the Bank and helped to set up a meeting between Bell and the Bank.  (*Id.* at 205:20-206:3; Pl.'s Suppl. Br., ECF No. 60-3, Ex. B).  Sciore was not certain if he had reviewed the resume, although he testified that he may have done so.  (*Id.*).  He testified that the Bank made its own hiring decisions and was responsible for double-checking the applicants' resumes.  (*Id.* at 207:4-8).  For his part, Sciore "helped grease the skids to get the LOs to [Husic]."  (*Id.* at 207:11-12).

Bell worked for the Bank for three months.  (*Id.* at 210:1-5; ECF No. 43-20, Ex. O at No. 10).  He generated no income.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 214:1-215-7; ECF No. 43-20, Ex. O at No. 10).  It appears that Bell had a hard time closing deals, and he complained to Sciore that the Bank would not bring on other outlets.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 215:14-21).  Although he expected to be compensated for his services, Sciore never requested a specific "referral fee" for recruiting Bell.  (*Id.* at 209:3-6; Resp., ECF No. 49-6, Sciore Decl., at ¶¶ 10, 18).  Sciore acknowledged that a referral fee is usually

calculated based on the production of mortgage volume. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 209:22-24). Because Bell did not generate any volume, the fee under this approach would be zero. (Mot. for Summ. J., ECF No. 43-20, Ex. O at No. 10). Sciore did briefly reference other ways a referral fee could be calculated at his deposition (i.e., "Some are commissioned. Some are on the production that they do, over-time."), and Bell also told Sciore that he was unhappy with the Bank and how it was operating and accordingly decided to leave. (Mot. for Summ. J., ECF 43-13, Ex. H at 209:6-24; Resp., ECF No. 49-6, Sciore Decl. at ¶ 26). In any event, Sciore admitted that Bell was not a "benefit" to the Bank's residential mortgage division. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 216:24-217:6).

Sciore reached out to Panto by telephone, possibly exchanged text message and met him in person on one occasion, and then sent him to the Bank. (*Id.* at 218:10-17, 226:13-16). He did not participate in the Bank's decision to offer Panto an interview, the scheduling of the interview, or in the Bank's decision to offer Panto a position. (*Id.* at 218:2-5, 224:22-225:2, 226:13-16). There was no referral agreement with the Bank regarding Panto. (*Id.* at 228:2-9). Sciore acknowledged at his deposition that a referral fee for Panto would usually be calculated based on a percentage of the loan volume. (*Id.* at 229:1-8).

Sciore also admitted that, based on the e-mails he had reviewed, Panto evidently worked only for seven months at the Bank, that he could not confirm whether Panto met his loan origination goals, and that he "somewhat recalled reading" in the Bank's documents that Panto generated $23,124 in gross revenue. (*Id.* at 229:9-230:1; 236:3-9; *see also* ECF No. 43-22. Ex Q at No. 11). Sciore testified that Panto was not a "benefit" to the Bank's residential mortgage division, although he indicated that this was the Bank's own fault (and Panto, like Bell, informed Sciore that he decided to leave because of displeasure with the Bank and its operations). (*Id.* at 236:23-237:6; Resp, ECF No. 49-6, Sciore Decl. at ¶ 26).

Sciore still expected to be compensated for recruiting Panto with referrals, lucrative business opportunities and top priority on his loans at the Bank.  (*Id.* at 228:6-12; Resp., ECF No. 49-6, Sciore Decl. at ¶ 10).  During his deposition, Sciore was shown an e-mail (dated September 30, 2016) regarding a meeting between the Bank and Panto to discuss Panto's interest in joining the Bank, and he acknowledged that there was no reference in this document to him or his involvement in recruiting Panto.  (Mot. for Summ. J. ECF No. 43-13, Ex. H at 225:6-24; *see also, e.g.*, Pl.'s Responsive Br., ECF No. 61-2, Ex. E at 4).  Questioned about "where in the 580 plus documents you produced" there is any document showing that he set up the Panto meeting or referred Panto to the Bank, he indicated that such documentation existed and that he would find it.  (*Id.* at 226:17-227:10).  However, he did not proffer any such documentation after the deposition.  When asked by e-mail for "all documents that supports Mr. Sciore's contention that Mr. Sciore established the referral of Tony Panto, the scheduling of the lunch, Mr. Score's knowledge of a lunch, or any other type of meeting," Sciore's former counsel responded that "Mr. Sciore has not been able to locate any documentation related to Mr. Panto mentioned in" that item.  (Reply Mem., ECF No. 52-1, Ex. A at 2-3) (citing Mot. for Summ. J., ECF No. 43-13, Ex. H at 227:11).  In a September 30, 2016 e-mail to the Bank's human resources manager, Husic explained that "Tony was introduced to us via Mike Sciore" and that "Tony worked for Mike for approx. 5-6 years as a MLO."  (Pl.'s Responsive Br., ECF No. 61-2, Ex. E at 2).

Because she knew they were friends and that Sciore could convince Bickel to join the Bank, Husic specifically asked Sciore to assist with recruiting Bickel from another bank.  (Resp, ECF No. 49-6, Sciore Decl. at ¶ 24).  At one point, Sciore asked Husic how "the Bickel deal" was going, adding that "I tried to put a lot of positives for him to weigh out."  (Resp., ECF No. 49-15, Ex. I at 4).  Bickel was hired and continues to work at the Bank in its commercial division.  (*Id.* at ¶ 25; Mot. for Summ. J. ECF No. 43-13, Ex. H at 250:1-7, 252:12-18).  Sciore

averred that, "upon information and belief, [Bickel] is one of [the Bank's] top producers." (Resp, ECF No. 49-6, Sciore Decl. at ¶ 24). Bickel has never worked in the Bank's residential mortgage division, and Sciore agreed that he was never a benefit to this specific division of the Bank. (Mot. for Summ. J. ECF No. 43-13, Ex. H at 250:1-7, 252:12-18). There was a potential for Bickel being hired for the residential mortgage division, and "it kind of went in that way" even though he ultimately was placed in the commercial division. (*Id.* at 252:12-18).

According to Sciore, his recruiting efforts on behalf of the Bank continued through the summer of 2016. (Resp., ECF No. 49-6, Sciore Decl. at ¶ 27). He exchanged e-mails with Husic discussing a potential loan officer named Steve Braslow in May 2016, and Husic subsequently e-mailed him on June 20, 2016, asking about potential hires in Lancaster. (*Id.* at ¶¶ 27-28) (citing Resp., ECF No. 49-11 Ex. E; ECF No. 49-12 Ex. F). "I also provided Defendant with advice regarding employment and investor contracts, and highlighted areas of potential risk in these contracts that they should review and/or bring to their counsel's attention." (*Id.* at ¶ 29) (citing Resp., ECF No. 49-13, Ex. G). Furthermore, "[b]eginning in or around 2015 through 2017, Ms. Husic asked me to provide her with names of potential clients and investors," and he did so, referring his own father to the Bank (who provided the Bank with a clear line of credit and deposited approximately $200,000 in CD deposits). (*Id.* at ¶¶ 31-32).

During his deposition, Sciore was asked about an April 2016 e-mail exchange he had with Husic concerning the pricing engine, "secondary marketing advice," and a "broker option":

Q:     And, in fact, Ms. Husic responds, does she not, on April 29, 2016 and says, "I already knew that" doesn't she?

MR. LITZ [Sciore's then-counsel]: Objection.

THE WITNESS: From this response, this has nothing to do with even with what I was actually sending her.

BY MS. MACDONALD-MATTHES [Counsel for the Bank]:

Q:      Well, it's in direct response to your e-mail, is it not?

A.      It's a response, but it's totally off target what we're talking about.

Q:      No.  Actually, we're talking about the same thing.  She says:  "Thanks.  I was aware of the loan officer pricing.  We are in the process of applying to Freddie as well," didn't she?

A.      Don't know how she could know that and at the same time admit she needs a pricing engine.  It's a conflict in itself.

Q:      Well, where does she admit that she needs a pricing engine?

A.      There's an e-mail.  I'll have to get it for you, but it's definitely in the documents provided that I read over with counsel.

Q:      Okay.  But I'm looking at this and you're offering your sage advice, wisdom, information here and she says, thanks, I got it already, I already know this, doesn't she?

        MR. LITZ:      Objection.

        THE WITNESS:  No, 'cause you have e-mails of her clearly identifying it's an eye-opening pricing engine.  I don't know the exact e-mail, but we can get it.  It's here.  It's definitely in that.

BY MS. MACDONALD-MATTHES:

Q:      So my question to you is in going through your 581 documents [produced by Sciore in discovery], this is the last document that you produced that there is any potential claim that you were providing advice to the Bank on -- or information to the bank on residential mortgage issues, correct?

        MR. LITZ:  Objection.

        THE WITNESS:  No, that's not true because the pricing engine took it from there, and they signed up October --  I'm sorry.  March of 2016 I think they actually signed up with the pricing engine, so the engine itself took over from there.

BY MS. MACDONALD-MATTHES

Q.      Would you agree with me that April comes after March?

A.      Yes.

Q.      Ok, so this is dated what?

A.      April 29th of 2016.

                                    9

Q.      Okay.  So there are no other documents beyond the April 29, 2016 date that you produced showing that you provided any information to Centric Bank in the complement of 581 documents you produced.

So my question is, you did not produce it, fair to say that you don't have it, correct?

A.      There was nothing really needed to be done after that point as far as documentation 'cause a lot of my services were in play.

Q.      Okay.  So as of April 29, 2016, you had, in you view, anyway, done everything that you could do as of this date?

A.      There was a good part done by then.

Q.      Okay.

A.      Whether there were some minor things to wrap up, there was a decent part one by that point.

(Mot. for Summ. J., ECF No. 43-13, Ex. H at 193:4-196:4).  Sciore hired "a secondary marketing consultant who taught Mr. Furey and I on how to expand our mortgage loan business."  (Resp., ECF No. 49-6, Sciore Decl. at ¶ 38).  The consultant was paid approximately $150,000 a year and "received a bonus on the bonus points for monthly profits of about .10 to .15 on monthly loan volume."  (*Id.*).

Asked at his deposition whether he ever suggested that he should be monetarily compensated in any manner by the Bank, Sciore responded:

Ever.  No.  We had plenty of discussions, me and Patty, about the referrals that they were going to send over to me, okay, and a couple which have gone no where.  And I expected a ton more for all the work that I did for them, which was recruitment, training, consulting, risk, and the biggest piece is the pricing engine. That's the big one.

(Mot. for Summ. J., ECF No. 43-13, Ex. H at 159:5-23).

Sciore has more than twenty-five years of business experience as well as an understanding of loan documents and the basic components of a contract (i.e., offer, acceptance, and consideration).  (*Id.* at 160:2-23).  He decided not to reduce the agreement to writing because

10

"of our relationship in lending."  (*Id.* at 163:8-9).  According to him, it was a delicate issue:

> Because we're in business.  We're lending.  They're lending to me.
> There's contracts in that.  They're asking me to do some services for
> the bank.  You know, she asked - - she asked what can I do for you.
> I said help me [with] referrals, but most importantly, help me with
> loans many, many years in the future so I can get my businesses to
> prosper.

(*Id.* at 163:12-19).

     For its part, "as of 2016, the [Bank] was not only assisting Sciore with his loan requests and making those loan requests come to fruition, but Centric was also sending Sciore leads and introducing him to established players in the residential mortgage industry [that he] otherwise would not have had the opportunity to meet."  (Resp., ECF No. 49, at ¶ 67) (citing Mot. for Summ. J, ECF No. 43-13, Ex. H at 151:13-22).  Specifically, the Bank introduced Sciore to individuals associated with the Pennsylvania Bankers Association ("PBA") and other mortgage company owners.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 103:15-105:5, 144:5-12; ECF No. 43-24, Ex. S).  Sciore became a select vendor with the PBA, and he thereby was able to introduce his AMI software to the association's 185 banking institution members.  (Mot. for Summ. J., ECF No. 43-13, at 106:1-3, 107:3-10).  AMI's business associate, Jen Bitterman, received a complimentary registration to the PBA's annual convention in Bermuda, and she introduced their software to an array of bankers in attendance.  (*Id.* at 107:15-108:13).  Sciore stated in his declaration that "any introduction that Defendant provided me to the [PBA] was for the benefit of Defendant as Ms. Husic specifically referred Mr. Sciore to work with her friend Cynthia Wallett at PBA."  (Resp, ECF No. 49-6, Sciore Decl. at ¶ 34).  It was Wallett who then introduced Sciore to some of the members.  (Mot. for Summ. J., ECF No. 43-13, at 107:3-8).  According to Sciore, he had to pay more than $5000 to work with PBA, and "I did not receive any benefit worth that much from the PBA."  (Resp., ECF No. 49-6, Sciore Decl. at ¶ 34).  The Bank also introduced Sciore to the executive vice president of the American Bankers

Association, and Sciore may have met with him.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 149:9-20).  It likewise introduced Sciore to the executive vice president of Movement Mortgage in Charlotte, North Carolina, but this individual could not make any decisions for his employer. (*Id.* at 150:1-24; Resp, ECF No. 49-6, Sciore Decl. at ¶ 33).  Finally, Sciore was provided an opportunity to purchase stock in the Bank (and the Bank asked him if he had any contacts who may be interesting in investing), but he determined that it was "not a good investment for me." (Mot. for Summ. J., ECF No. 14-13, Ex. H at 153:18-155:4; Resp., ECF No. 49-6, Sciore Decl. at ¶ 35; ECF No. 49-5. Ex. I).

## II.    PROCEDURAL HISTORY

Sciore, together with various entities owned and controlled by him, entered into several loan transactions ("Sciore Loans") with the Bank.  (Notice of Removal, ECF No. 1-15, Ex. L at ¶ 1).  These loans are the subject of multiple confessed judgments in the Pennsylvania state courts. Specifically, the Bank has obtained two confessed judgments against him in the Schuylkill County Court of Common Pleas totaling $552,858.52 as well as thirteen confessed judgments in the Dauphin County Court of Common Pleas in the total amount of $12,756,474.46.  (Mot. for Summ. J., ECF No. 43-6, Ex. A).  On June 25, 2020, Sciore and several other related parties filed a Writ of Summons in the Philadelphia Court of Common Pleas, naming the Bank and Husic as Defendants. (Mot. for Summ. J., ECF No. 43-7, Ex. B).  He served pre-complaint discovery requests concerning, inter alia, the Sciore Loans, the Bank's residential mortgage division and his relationship to this division, and the recruitment of Bickel.  (Mot. for Summ. J., ECF No. 43-8, Ex. C).  Following a discovery conference conducted by a court-appointed judge pro tem, the Bank's Motion for Protective Order was granted, and Plaintiffs were ordered to file a Complaint. (Mot. for Summ. J., ECF No. 43-12, Ex. G).  The Verified Complaint was filed on November 12,

2020.  (Notice of Removal, ECF No. 1-15, Ex. L).

Both the Schuylkill and Dauphin County courts have denied petitions to strike/open the confessed judgments.  (Mot. for Summ. J., ECF No. 43-9, Ex. D; ECF No. 43-11, Ex. F).  The Pennsylvania Superior Court affirmed the Schuylkill County denial (Mot. for Summ. J., ECF No. 43-10, Ex. E), and the appeals from the Dauphin County order are still pending (Mot. for Summ. J., ECF No. 43-5, Concise Statement of Material Facts at 2 n.3).

The Complaint filed in this action, verified by Sciore, listed one Plaintiff (Sciore) and a single Defendant (the Bank).  (*Id.* at ¶¶ 2-3).  Sciore sets forth two counts in his Complaint: (1) unjust enrichment; and (2) quantum meruit.  (*Id.* at ¶¶ 40-62).  On December 1, 2020, the Bank removed the case to this Court.  (Notice of Removal, ECF No. 1).

On February 9, 2021, the parties consented to my jurisdiction, and the Honorable C. Darnell Jones, II, referred this case to me.  (Order, ECF No. 14).  On July 23, 2021, the Court granted in part and denied in part the Bank's First and Second Motions for a Protective Order. (Mem., ECF No. 34; Order, ECF No. 35).  According to the Bank, "Plaintiff embarked on a fishing expedition in the hopes that he would find some basis to salvage his untenable claims." (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 2).  It asserts that, despite its extensive production of documents (including documents that he had advised the Court he needed to schedule depositions), "Plaintiff failed to uncover (or produce) any documents that would support his claim(s)" and "also failed to depose <u>any</u> witnesses prior to the deadline for the close of discovery, (a deadline that the Court may recall was twice extended at Plaintiff's special insistence and request)."  (*Id.*; *see also, e.g.*, ECF No. 43-3, Ex 1; ECF No. 43-4, Ex. 2).  Sciore did not take any depositions prior to the close of discovery.  (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 9 n.5).  CEO Husic was originally scheduled to be deposed on October 5, 2021. (Mot. for Summ. J., ECF No. 43-3, Ex 1).  But her deposition was cancelled by Sciore's counsel,

13

even though the discovery deadline had been extended in order to permit him to depose the Bank's chief executive officer.  (*Id.*; ECF No. 43-4, Ex. 2; Order, ECF No. 40).  Fact discovery closed on October 13, 2021.  (Order, ECF No. 40).

The Bank moved for summary judgment on December 23, 2021 (Mot. for Summ. J., ECF No. 43), and Sciore filed his opposition to the motion on February 2, 2022 (Resp., ECF No. 49).  On February 15, 2022, the Bank filed a reply memorandum in support of its motion for summary judgment.  (Reply Mem., ECF No. 52).  On September 28, 2022, the Court directed each party to file a supplemental brief "addressing whether or not Plaintiff—by (1) recruiting (a) Joseph Bell, (b) Anthony Panto, and (c) Christopher Bickel, (2) assisting in selection of a pricing engine, and (3) providing referrals as well as guidance and advice regarding employment and investor contracts—has or has not actually conferred a *benefit* on Defendant."  (Order, ECF No. 58).  The parties were directed to include "record citations" to "competent evidence" supporting their respective arguments.  (*Id.*).  Each party was also ordered to file supplemental reply briefs.  (*Id.*).  The supplemental briefs were simultaneously filed as directed on October 12, 2022, Sciore filed his supplemental responsive brief on October 19, 2022, and the Bank filed its responsive brief on October 20, 2022.  (Def.'s Suppl. Mem., ECF No. 59; Pl.'s Suppl. Br., ECF No. 60; Pl.'s Responsive Br, ECF No. 61; Def.'s Suppl. Responsive Br., ECF No. 62).

## III.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party.

*Id.*  It is not the Court's role to weigh the disputed evidence and decide which is more probative or to make credibility determinations.  Rather, the Court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  *See, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88; *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the Court must accept as true the evidence adduced by the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 158-59 (1970)).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the non-moving party must come forward with specific facts showing there is a genuine issue for trial.  *See, e.g.*, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  *See, e.g.*, *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Instead, the non-moving party must present "specific facts" or "affirmative evidence" in order to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 256-57.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82 (1967) (per curiam); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

Under the "sham affidavit" doctrine, "[i]f a party's deposition and [subsequent] affidavit are in conflict, the affidavit is to be disregarded unless a legitimate reason can be given for the discrepancies." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (quoting 11 James Wm. Moore, et al., *Moore's Federal Practice* § 56.149[1][f], at 56-179 (3d ed. 1997)). "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). "When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue in dispute can be perceived as a sham." *Baer*, 392 F.3d at 624 (quoting *Shelcusky v. Garjulio*, 797 A.2d 138, 144 (N.J. 2002)).

## IV.    DISCUSSION

Sciore raises claims for unjust enrichment and quantum meruit against the Bank. (Notice of Removal, ECF No. 1-15, Ex. L at ¶¶ 40-63). To establish a claim for unjust enrichment, a plaintiff must prove: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of such benefit by the defendant; and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff." *MRO Corp. v. Humana Inc.*, 383 F. Supp. 3d 417, 424 (E.D. Pa. 2019) (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010)). "The polestar of the unjust enrichment inquiry is whether the defendant has been *unjustly* enriched; the intent of the parties is irrelevant." *Limbach Co. v. City of Phila.*, 905 A.2d 567, 577 (Pa. Commonw. Ct. 2006) (citing *Mitchell v. Moore¸* 729 A.2d 1200, 1204 (Pa. Super. Ct. 1999)). Accordingly, the plaintiff must show that the defendant either wrongfully secured or at least passively received a benefit, which it would be unconscionable for the defendant to retain. *See, e.g.*, *MRO Corp.*, 383

16

F. Supp. 3d at 424. "There must also be an unconscionable injustice in permitting the benefit to be retained without compensation." *Glob. Ground Support, LLC v. Glazer Enters.*, 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008) (citing *Torchia v. Torchia*, 449 A.2d 581, 582 (Pa. Super. Ct. 1985)). "[A] claim of unjust enrichment is not defeated if the plaintiff received value in exchange for the benefit it conferred." *In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 330 (E.D. Pa. 2011) (citing *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 545 (D.N.J. 2004)). However, "[a] benefit conferred is not unjustly retained if a party confers the benefit with the hope of obtaining a contract." *Burton Imaging Grp. v. Toys "R" Us, Inc.¸* 502 F. Supp. 2d 434, 440 (E.D. Pa. 2007) (addressing claim for benefits conferred during contract negotiations). "A 'benefit' is 'any form of advantage.'" *Id.* (quoting 16 Summ. Pa. Jur.2d *Commercial Law* § 2:2 (2006)). Ultimately, "whether the doctrine of unjust enrichment applies 'depends on the unique factual circumstances of each case.'" *Century Indem. Co. v. URS Corp.*, Civil Action No. 08-5006, 2009 WL 2446990, at *6 (E.D. Pa. Aug. 7, 2009) (quoting *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993)). A quantum meruit claim likewise requires proof of the following three elements: (1) "benefits conferred on defendant;" (2) "appreciation of such benefits by defendant;" and (3) "acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Shafer Elec. & Constr. v. Mantia,* 67 A.3d 8, 12 n.5 (Pa. Super. Ct. 2013) (quoting *Temple Univ. v, Healthcare Mgmt. Alts.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003)), *aff'd on other grounds*, 96 A.3d 989 (Pa. 2014).

According to Sciore's summary judgment briefing, he conferred the following benefits on the Bank: (1) recruitment services; (2) a pricing engine; (3) referrals; and (4) guidance and advice. (Resp., ECF No. 49-16, at 6-9) He contends that "record facts show that Defendant reached out to Sciore for assistance related to its failing mortgage division because of his

expertise in the mortgage area" and that, "with the understanding that he would be compensated, [he] provided a plethora of services to Defendant beginning from 2014 until at least 2017." (*Id.* at 6-7) (citing Mot. For Summ. J., ECF No. 43-13, Ex. H, at 228:6-15; ECF No. 49-6, Sciore Decl. at ¶¶ 6, 10, 18). Even though the services purportedly were "ones that Defendant in the normal course of business would have had to hir[e] someone to perform," "Defendant failed to provided Sciore with the compensation he was promised." (*Id.* at 7).

The Bank contends that it is entitled to summary judgment because: (1) the claims are barred by the statute of limitations; (2) Sciore did not confer any benefit on the Bank; (3) any assistance he provided to the Bank was nothing more than a gift; (4) it would not be unfair to deny him compensation under the circumstances; and (5) Sciore filed this litigation in retaliation for confessed judgments obtained by the Bank on the defaulted Sciore Loans. (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 7-20). In addition to questioning the authenticity of the exhibits attached to the Bank's motion for summary judgment, Sciore asserts that his causes of action were filed in a timely fashion, he provided the Bank with various benefits (and, with one exception, the benefits he conferred were not gifts), the Bank did not compensate him despite its obligation to do so, and he did not file this action in retaliation for the confessed judgments. (Resp., ECF No. 49-16, at 4-12). In its reply, the Bank reiterates and expands upon its arguments in favor of summary judgment. (Reply Mem., ECF No. 52, at 2-19). It takes issue with Sciore's authenticity challenge and further contends that Sciore's declaration—which was executed after his deposition and was included with his opposition to the motion for summary judgment—violates the "sham affidavit" doctrine. (*See id.*).

In the supplemental memorandum filed in response to this Court's order, the Bank argues that the order for additional briefing "illuminates the glaring omission of any actual evidence of a benefit, in Plaintiff's submission," which "is reflective of the groundless nature of Plaintiff's

claims and his failure to conduct basic discovery including deposing any officer of Centric Bank to establish the existence of an actual benefit related to the services he claims to have provided." (Def.'s Suppl. Mem., ECF No. 59, at 2). The Bank also continues to assert that Sciore's "self-serving Declaration" violates "the Court's well-established Sham Affidavit doctrine." (*Id.*). According to his supplemental brief, "Plaintiff has raised a factual issue as to the 'benefit' conferred to and retained by Defendant to defeat summary judgment." (Pl.'s Suppl. Br., ECF No. 60, at 2). In particular, Sciore argues that the Bank: (1) "received a benefit in both gross revenues generated by Mr. Panto and services performed by Mr. Panto and Mr. Bell;" (2) "received a benefit from Plaintiff's referral of Mr. Bickel and was further enriched by Mr. Bickel's services;" (3) "was benefited by Plaintiff's service of selecting a pricing engine;" and (4) "received a benefit in Plaintiff's referral of candidates, investment interest, and business guidance upon Defendant's initiation." (*Id.* at 2-5) (emphasis omitted). In his supplemental responsive brief, Sciore reiterates and further develops his "benefit" arguments, takes issue with Bank's allegedly "arbitrary" approach to what may or may not constitute a "benefit," and asserts that his declaration is not a "sham affidavit." (Pl.'s Responsive Br., ECF No. 61, at 1-7). For its part, the Bank contends that Sciore's supplemental submissions "regurgitate the unsupported allegations that have characterized his entire claim." (Def.'s Suppl. Responsive Br, ECF No. 62, at 2). According to the Bank, his failure to depose any Bank officer is fatal to his attempt to identify any credible or objective evidence in support of his claims, and nothing in his supplemental briefs address the deficiencies identified by the Bank. (*Id.*). In addition to claiming that Sciore did not confer any benefit, the Bank argues that, even if he did, there is no evidence that the Bank's retention of such benefits would be unconscionable. (*Id.* at 2-8).

The Court rejects Sciore's challenge to the exhibits submitted by the Bank. It also need not—and does not—rule on the Bank's statute of limitations defense because, regardless of

whether the claims were filed in a timely fashion, the Bank is still entitled to summary judgment on the grounds that Sciore has failed to satisfy the "benefit" element essential to his claims for unjust enrichment and quantum meruit.  Although given additional time to conduct discovery and specifically ordered to brief—with record citations to supporting evidence—the "benefit" issue, Sciore has failed to cite to competent evidence that would permit a reasonable jury to find by a preponderance of the evidence that his actions actually conferred a benefit on the Bank. *See, e.g.*, *Celotex Corp.*, 477 U.S. at 322-23 (observing that summary judgment should be entered against non-party who fails to make sufficient showing on essential element of claim with respect to which that party has burden of proof at trial).  Because allegations or claims "without evidence creating issues of fact are not triable," the Court must "test [the] allegations for supporting facts before summoning citizens for a jury."  *D'Angelo v. Vanguard Grp., Inc.*, CIVIL ACTION NO. 21-4813, 2022 WL 16857033, at *1 (E.D. Pa. Nov. 10, 2022); *see also, e.g.*, *Anderson*, 477 U.S. at 249-50, 256-57 (stating that non-moving party must present specific facts or evidence to defeat properly supported motion for summary judgment and that summary judgment may be granted if evidence is merely colorable or not significantly probative).  Given the lack of competent evidence that he conferred benefits on the Bank, Sciore's claims against the Bank do not pass this test.

## A.    Authenticity

According to Sciore, "Defendant has failed to correctly authenticate the exhibits referenced in its Rule 56.1 Statement of Facts" because it "has not provided a declaration attaching the referenced exhibits (namely those that were not provided by Sciore during discovery.)."  (Resp., ECF No. 49-16, at 4).  There is no "Rule 56.1" in the Federal Rules of Civil Procedure, and Eastern District of Pennsylvania Local Rule 56.l governs "Judgments pursuant to a Warrant of Attorney."  (Reply Mem., ECF No. 52, at 3-4).  Furthermore, my

General Policies and Procedures regarding "general Motion Practice" do not set forth any "declaration" requirement.  (*See* Judge Lynne A. Sitarski's General Policies and Procedures at 2).

Sciore does cite to Rule 56(c)(2), which provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  (Resp, ECF No. 49-16, at 4).  He also refers to Rule 56(c)(4), stating that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  (*Id.*)  However, Rule 56 does not explicitly require the moving party to submit an affidavit or declaration authenticating the exhibits filed in support of the motion for summary judgment.  In this case, the exhibits included with the Bank's motion for summary judgment appear to be authentic, and Sciore does not articulate any specific grounds for questioning their authenticity.  In fact, several of the same documents, including Sciore's deposition, were attached to the declarations filed with Sciore's response to the motion for summary judgment.  (*See* Mot. for Summ. J., ECF No. 43-13, Ex. H; ECF No. 43-19, Ex  N; ECF No. 43-21, Ex. P; ECF No. 43-22, Ex. Q; Resp., ECF No. 49-1, Ex A; ECF No. 49-4, Ex. C; ECF NO. 49-13, Ex. G).

Accordingly, the Court considers in its analysis the exhibits submitted by the Bank in support of its summary judgment motion.[2]

---

[2]  Prior to the 2010 amendments to Rule 56, an exhibit could be used in a motion for summary judgment only if it were made part of an affidavit, and, "to be admissible, documents had to be authenticated by and attached to an affidavit that met the requirements of Rule 56 and the affiant had to be the person through whom the exhibits could be admitted into evidence." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2722 (4th ed. 2022) (footnotes omitted).  However, the amendments "omitted these specific requirements, and simply added to the list of appropriate 'documents.'"  *Id.* (footnote omitted).  "As explained in the Committee Note, the requirements were viewed 'as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.'"

### B.    Benefits Conferred

In his briefing, Sciore asserts that he conferred the following benefits on the Bank: (1) recruitment services; (2) a pricing engine; (3) referrals; and (4) guidance and advice.  (Resp., ECF No. 49-16, at 6-9).  The Verified Complaint alleges that, in addition to assisting with "developing a residential mortgage division for the Bank," Sciore was involved in "launch[ing] [the Bank's] residential mortgage division in January of 2016."  (Notice of Removal, ECF No. 1-15, Ex. L at ¶¶ 13, 20).  However, it is undisputed that the Bank's residential mortgage division already existed when he first offered his assistance to the Bank, and Sciore no longer claims that he helped to "create" or "launch" the division.  (*See, e.g.*, Mot. for Summ. J., ECF No. 43-13, Ex. H at 76:16-77:11).  Likewise, Sciore does not argue that the software he provided the Bank constituted a "benefit" for purposes of his claims for unjust enrichment and quantum meruit.  On the contrary, it is undisputed that he gave the AMI software to the Bank as a gift.  (*See* Mot. for Summ. J, ECF No. 43-13, Ex. H at 101:1-17, 180:15-181:13; Answer, ECF No. 32-2, Ex. B at 2; Resp., ECF No. 49-16, at 9).

The Bank questions both the extent and usefulness of Sciore's recruiting efforts as well as whether recruiting Bell, Panto, and Bickel actually benefited the Bank and its residential mortgage division.  (Mot. for Summ. J., ECF No. 43-2, at 13-16; Reply Mem., ECF No. 52, at 9-18; Def.'s Suppl. Mem., ECF No. 59, at 3-8; Def.'s Suppl. Responsive Br, ECF No. 62, at 2-4, 6-

---

*Id.* (quoting Fed. R. Civ. P. 56 advisory committee note to 2010 amendments).  Under the current approach, the substance or content of the evidence must be admissible, but it need not be presented in a form that would itself be admissible at trial.  *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)).  "Many courts have now held that authentication is required only if a question is raised about whether the document can be authenticated at trial."  11 James Wm. Moore, et al., *Moore's Federal Practice* § 56.92[3] (2022).

The Bank's counsel should have submitted an affidavit or declaration specifically authenticating its exhibits.  However, given the absence of any specific reason to question the authenticity of this evidence as well as the absence of any proffered basis for challenging the authenticity of the documents at time of trial, the Court will consider the exhibits at this time.

7).  The Court need not (and does not) reach the issue of Sciore's level of involvement in the Bank's hiring of the three individuals because, even assuming arguendo that Sciore was substantially involved in recruiting them, his recruiting activities did not confer a "benefit" on the Bank.  Given the record evidence and the parties' briefing, the Court determines that there is not sufficient evidence to allow a reasonable finder of fact to conclude that Sciore's "headhunting" activities actually benefited the Bank.  Specifically, Sciore has not cited to competent evidence in the record that could establish by a preponderance of the evidence that he conferred a benefit on the Bank by recruiting either Bell, Panto, or Bickel.  Even though he had ample time and opportunity to undertake discovery in this matter (*see, e.g.*, Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 2; ECF No. 43-3, Ex 1; ECF No. 43-4, Ex. 2), his claims against the Bank ultimately rest on nothing more than unsupported allegations and speculation.  *See, e.g.*, *Trap Rock Indus., Inc.*, 982 F.2d at 890 (stating that non-moving party may not rest upon mere allegations, general denials, or vague statements); *D'Angelo*, 2022 WL 16857033, at *14 ("Allegations and wild speculation are not evidence.").  In fact, the evidence before this Court indicates that the Bank did not receive any type of "advantage" from Sciore's "headhunting," *Burton Imaging Grp.*, 502 F. Supp. 2d at 440 ("A 'benefit' is 'any form of advantage.'") (citation omitted).

It is undisputed that Bell was employed by the Bank for a mere three months.  (*Id.* at 210:1-5; ECF No. 43-20, Ex. O at No. 10).  In fact, he generated no income for the Bank while serving as a loan officer.  (Mot. for Summ. J., ECF No. 43-13, Ex. H at 214:1-215:7; ECF No. 43-20, Ex. O at No. 10).

Sciore admits in his supplemental briefing that "Mr. Bell's employment did not last long and he did not generate revenue."  (Pl.'s Suppl. Br., ECF No. 60, at 3).  However, he contends that "Defendant was still enriched in the way of saving recruiting efforts with Plaintiff's

assistance to fill the position that Mr. Bell held." (*Id.*) (citing *Caring People All. v. Educ. Data Sys., Inc.*, Civil Action No. 07-1267, 2008 WL 4441994, at *10 (E.D. Pa. 2008)).  Citing to a ruling by Judge Dalzell purportedly "rejecting defendant's argument that there was no benefit because 'defendant lost money on the deal,'" he asserts that the Bank "totally disregards the expenses in recruitment that it has saved because of Plaintiff's headhunting efforts." (Pl.'s Responsive Brief, ECF No. 61, at 3) (quoting *Caring People All.*, 2008 WL 4441994, at *10). Sciore also argues that "Defendant fails to provide any legal support as to why 'benefit' should be determined based on the parties' intention, which contradicts Pennsylvania case law." (*Id.*) (citing *Century Indem. Co.*, 2009 WL 2446990, at *6).  The Bank denies that it argues that the parties' intention should control the "benefit" determination, and contends that Sciore does not cite "to a Centric [Bank] discovery response or to deposition testimony from a Centric witness" to support his argument that the Bank would have had to incur headhunting expenses but for his "headhunting" activities. (Def.'s Suppl. Responsive Br., ECF No. 62, at 3-4, 7).  According to the Bank, "not only is this [headhunting] statement little more than conjecture; it also violates the Court's September 28, 2022 Order that the 'briefs shall include record citations to competent evidence supporting their arguments.'" (*Id.*) (quoting Order, ECF No. 58).

The parties' alleged "intentions" play no role in the Court's consideration of whether any benefit was conferred on the Bank.  Instead, the Court concludes that Sciore has failed to provide any "record citations to competent evidence" in support of his argument that the Bank saved on "headhunting" expenses (Order, ECF No. 58).  Despite being given a more than adequate opportunity to conduct discovery in this matter (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 2; ECF No. 43-3, Ex 1; ECF No. 43-4, Ex. 2), Sciore has not come forward with admissible evidence indicating that recruiting Bell benefited the Bank in any way.  In particular, he has not provided any record citations to evidence—such as the Bank's financial statements or the

24

deposition of a Bank officer like Husic—in support of his "headhunting expense" theory. At best, he thus offers nothing more than factually unsupported assertions and speculation to support his "benefit" allegations. *See, e.g.*, *D'Angelo*, 2022 WL 16857033, at *14 ("Allegations and wild speculations are not evidence."). In fact, Sciore admitted at his own deposition that Bell was not a "benefit" to the Bank's residential mortgage division. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 216:24-217:6). Additionally, Sciore points to no evidence to support the conclusion that a professional recruiter would have received any compensation for recruiting Bell. On the contrary, Sciore mentioned other ways a referral fee could be calculated at his deposition, but he also admitted that such a fee is usually calculated based on the production of mortgage volume. (*Id.* at 209:22-24). Because Bell did not generate any volume, the fee under this usual approach would be zero.[3] (Mot. for Summ. J., ECF No. 43-20, Ex. O at No. 10).

The Bank's discovery response indicated that Panto generated $23,124 in gross revenue. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 229:9-230:1, 236:3-9; ECF No. 43-22. Ex Q at No.

---

[3] Sciore turns for support to Judge Dalzell's ruling in *Caring Peoples Alliance*. "CPA [Plaintiff Caring People Alliance] and EDSI [Defendant Educational Data Systems, Inc.] entered into a contract to use funding from the Philadelphia Workforce Development Corporation ['PWDC'] to provide workforce development services to welfare recipients in Philadelphia." *Caring People All.*, 2008 WL 4441994, at *1 (citation omitted). According to Judge Dalzell, CPA conferred a benefit on EDSI by paying "salaries of staff at the EARN Center, for which it expected to be reimbursed." *Id.* at *10. Although EDSI argued that it was not enriched by CPA's conduct because it "lost money on the deal," it nevertheless continued to operate the center, and the plaintiff continued to pay some of the center's staff. *Id.* (citation omitted). "If CPA had stopped paying these salaries, EDSI would have had to pay them, and thus would have incurred more cost. From EDSI's perspective, CPA was a benefit because it permitted EDSI to spread the risk of a funding shortfall to yet another subcontractor." *Id.*

*Caring People Alliance* does not resemble the facts of this case. Specifically, Sciore does not cite to any competent evidence indicating that the Bank would have incurred additional expenses in order to recruit Bell (or the other two recruited individuals) without Sciore's assistance. In turn, there is no competent evidence in the record showing that a professional "headhunter" would have received a referral fee for recruiting Bell, and, in fact, any referral fee calculated under the normal approach would have been zero. In contrast, EDSI would have had to pay the staff for their work if it were not for CPA.

11).  According to Sciore: "In an unjust enrichment claim, a 'benefit' can be found in the actual profits that the defendant made with the plaintiff's services and assistance.  *See Killian v. Ricchetti*, No. CV 16-2874, 2016 WL 6471245, at *6 (E.D. Pa. Oct. 31. 2016) (finding unjust enrichment in the defendant's sales of property with the plaintiff's []proposals and work[] with the attorney, architect, and zoning board on [the property] without sharing any money)."  (Pl.'s Suppl. Br., ECF No. 60, at 2).  In addition to claiming that his recruiting services saved the Bank from incurring "headhunting" expenses, Sciore contends that the gross revenue Panto generated by settling three mortgage loans constituted a benefit to the Bank.  (*Id.* at 2-3; Pl.'s Responsive Br., ECF No. 61, at 5).  Citing to *Black's Law Dictionary*, the Bank asserts that "actual profits" and "gross revenue" are not synonymous and that the term "revenue" merely means income generated through business operations unreduced by business expenses.  (Def.'s Suppl. Responsive Br., ECF No. 62, at 3).  The Bank further argues that Sciore "offers no 'competent evidence' that the obvious expenses related to any employee such as wages, benefits, and training over a seven-[month] period were less than the amount Mr. Panto produced in gross revenue."  (*Id.*).

Sciore has failed to adduce competent evidence establishing that recruiting Panto conferred a benefit on the Bank.  The Court has already considered and rejected Sciore's "headhunting expense" theory.  As to the Sciore's "gross revenue" assertion *Black's Law Dictionary* defines "gross" as "[u]ndiminished by deduction; entire <gross profits>," *Gross, Black's Law Dictionary* (11th ed. 2019), and "revenue" is defined as "[i]ncome from any and all sources; gross income or gross receipts," *Revenue, Black's Law Dictionary* (11th ed. 2019).  In contrast, "profit" is defined as "the excess of revenues over expenditures in a business transaction; GAIN." *Profit, Black's Law Dictionary* (11th ed. 2019), Sciore has not cited to any evidence that recruiting Panto generated any "actual profits" for the Bank, i.e., that the "gross

revenues" he earned for the Bank "exceeded" the Bank's "expenditures" for hiring and employing this loan officer (e.g., wages, benefits, and training). Other than the "gross revenue" figure, Sciore has failed to cite to any other evidence indicating that recruiting this individual benefited the Bank, and, without this additional evidence, a reasonable jury could not find in Sciore's favor on the "benefit" element of his claims. In fact, Panto only worked at the Bank for seven months, and Sciore could not confirm whether he met his loan origination goals. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 229:1-230:1; 236:3-9; ECF No. 43-22, Ex. Q at No. 11). Sciore even admitted under oath that—just like Bell—Panto was not a "benefit" to the Bank's residential mortgage division.[4] (Mot. for Summ. J., ECF No. 43-13, Ex. H at 236:23-237:6). Even if (as Sciore, Panto, and Bell have indicated (*see, e.g.*, *id.* at 215:14-21, 236:20-237:6)) it was the Bank that caused the two individuals' lack of success, the record is devoid of actual evidence that would support a factfinder's conclusion that either individual was a benefit to the Bank.

As to the third individual recruited by Sciore, it appears undisputed that—while Bickel remains employed as a loan officer by the Bank—he has at all times worked in the commercial division as opposed to the Bank's residential mortgage division. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 252:1-24). The parties dispute the significance of this fact for purposes of the "benefit" issue. Sciore claims that the Bank is attempting to draw an arbitrary and meaningless line between the two divisions, and the Bank insists that, "[i]f this line is 'arbitrary' it began at

---

[4]  Sciore cites to the opinion in *Killian*, but, in that case, Judge Kearney determined that there were genuine disputes of material fact as to whether "Killian's work for Ricchetti's 2nd and Brown Street vacant lot conferred a benefit on Ricchetti," who actually sold the lot at issue for $740,000 and did not give any money from the sale to Killian despite the work Killian had done for the lot. *Killian*, 2016 WL 6471245, at *3, *7 ("Killian acquired proposals and worked with the attorney, architect, and zoning board on the 2nd and Brown Street project. Ricchetti e-mailed to Killian, 'I could not have done it without you and Chris.'") (footnote omitted). In contrast, Sciore acknowledges that Panto was not a "benefit" to the Bank's residential mortgage division. (Mot. for Summ. J., ECF No. 43-13, Ex. H at 236:23-237:6).

Plaintiff's Complaint," which repeatedly references the residential mortgage division and does not include any allegation that Sciore conferred a benefit on the Bank's commercial division. (Resp., ECF No. 49-16, at 7; Reply Mem., ECF No. 52, at 11; Pl.'s Responsive Br., ECF No. 61, at 5-6; Def.'s Suppl. Responsive Br., ECF No. 62, at 7).  The Court need not—and does not— rule on the significance of the specific branch for which Bickel works in order to resolve the Bank's summary judgment motion.  Assuming arguendo that Bickel's work as a commercial (and not a residential) loan officer could constitute a benefit for purposes of Sciore's claims against the Bank, the Court nevertheless determines that Sciore has failed to point to competent evidence in the record that would permit a reasonable jury to find by a preponderance of the evidence that such work was a benefit to the Bank itself.

Initially, the Court must set aside Sciore's unsupported averment that Bickel is one of the Bank's top loan officers or "producers."  Sciore contends that "Defendant appears to not contest the fact that Mr. Bickel remains to be one of the top loan officers with Defendant."  (Pl.'s Responsive Br., ECF No. 61, at 5) (citing Resp., ECF No. 49-6, Sciore Decl. at ¶ 25).  But the Bank does note that the averment was based "upon information and belief" and asserts that this statement "does not satisfy the standard of Rule 56 which requires that affidavits to 'oppose a motion must be made on personal knowledge.'"  (Reply Mem., ECF No. 52 at 11) (quoting Resp., ECF No. 49-6, Sciore Decl. at ¶ 25).  It is well established that, "at the summary judgment stage, assertions that are merely based upon 'information and belief' are insufficient."  *Mudie v. Phila. Coll. of Osteopathic Med.*, Civ. No. 21-2156, 2022 WL 1607544, at *15 n.24 (E.D. Pa. May 20, 2022) (citing *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Cooperative*, Civil Action No. 15-6480, 2021 WL 1907501, at *3 (E.D. Pa. May 12, 2021); *Disilverio v. Serv. Master Professional*, Civil Action No. 05-1368, 2007 WL 1029759, at *7 (W.D. Pa. Mar. 31, 2007)). Accordingly, the Court does not credit Sciore's unsupported averment that, "upon information

and belief, Mr. Bickel is one of the Bank's top producers" (Resp., ECF No. 49-6, Sciore Decl. at ¶ 25).

Sciore needs facts or evidence in order to defeat the Bank's motion for summary judgment. *See, e.g.*, *Anderson*, 477 U.S. at 256-57; *D'Angelo*, 2022 WL 16857033, at *1. Sciore has not complied with this Court's directive to set forth record citations to competent evidence supporting his argument that recruiting Bickel actually benefited the Bank (Order, ECF No. 58). In his initial supplemental brief, he instead focuses on his level of involvement in recruiting Bickel and accordingly does not identify the evidence in the record purportedly establishing that his recruiting efforts resulted in a benefit for the Bank. (Pl.'s Suppl. Br., ECF No. 60, at 3-4). He thereby does not point to competent evidence that his actions related to Bickel resulted in any sort of "advantage" to the Bank, *Burton Imaging Grp.*, 502 F. Supp. 2d at 440. In his responsive brief, Sciore asserts in passing that the Bank does not appear to contest the fact that Bickel remains one of the Bank's top loan officers (Pl.'s Responsive Br., ECF No. 61, at 5), but (as noted above) the Court must set aside his factually unsupported averment on this point. In the end, all Sciore really has to support his "benefit" allegations is the fact that Bickel is still employed by the Bank as a commercial loan officer. However, a reasonable finder of fact could not find that recruiting Bickel conferred a benefit on the Bank merely because of Bickel's employment status. Without additional evidence, any factual finding of a benefit as to Bickel would rest on nothing more than speculation and conjecture—and Sciore has failed to identify any additional evidence to support this finding.

In particular, Sciore has not pointed to actual evidence concerning the income or revenue Bickel has produced—even though this Court has this sort of data for the other two individuals recruited by Sciore. In fact, the Court denied the Bank's Motion for Protective Order as to Sciore's request for production of documents relating to Bickel's hiring and any revenue

generated by him.  (Mem., ECF No. 34, at 6-9).  Despite successfully claiming in his response to this discovery motion that the documents are relevant in light of his allegation that "Bickel generated significant revenue for the Bank (not the Residential Mortgage Division) subsequent to his hiring" (*id.* at 17) (quoting Pl.'s First Opp., ECF No. 21, at 10), Sciore does not proffer or even mention the existence of any revenue documentation.  More broadly, he likewise does not refer to any other records or evidence regarding Bickel's work for the Bank and how it could have provided advantages for the Bank.  Sciore did not "depose *any* witnesses prior to the deadline for the close of discovery," even after the deadline was extended at his request.  (Mot. for Summ. J., Mem. of Law, ECF No. 43-2, at 2; *see also, e.g.*, ECF No. 43-3, Ex 1; ECF No. 43-4, Ex. 2).  For instance, he could have deposed the Bank's chief executive officer, Husic.  But Sciore's counsel abruptly cancelled Husic's scheduled deposition, and discovery was then closed without Sciore ever taking the deposition of either Husic or any other Bank officer or employee.  (Mot. for Summ. J., ECF No. 43-3, Ex 1; Order, ECF No. 40).

Sciore asserts that, "[i]n addition to recruiting personnel for Defendant," Sciore also found a pricing engine for the Bank's mortgage department, which the Bank continues to use.  (Resp., ECF No. 49-16, at 8).  The parties present opposing arguments concerning the Bank's knowledge of pricing engines, whether it requested Sciore's assistance in selecting an engine, and the timeliness of any "pricing engine" claim.  (Reply Mem., ECF No. 52, at 17; Def.'s Suppl. Mem., ECF No. 59, at 9-10; Pl.'s Responsive Br., ECF No. 61, at 6; Pl.'s Suppl. Br., ECF No. 60, at 4; Def.'s Suppl. Responsive Br, ECF No, 62, at 4-5).  The Court need not—and does not—rule on these arguments because it finds that there is no genuine dispute of material fact as to whether Sciore's assistance in selecting the pricing engine actually conferred a *benefit* on the Bank.

"Allegations without evidence creating issues of fact are not triable."  *D'Angelo*, 2022

WL 16857033, at *1.  In his supplemental briefing, Sciore merely references the Bank's need for a pricing engine, his role in the process to select (and install) the engine, and the fact that the Bank still uses the pricing engine he helped to pick out.  (Pl.'s Suppl. Br., ECF No. 60, at 4-5; Pl.'s Responsive Br., ECF No. 61, at 5).  He contends that the Bank presents no evidence that it would have researched and selected a pricing engine by itself.  (*Id.*).  Sciore thereby has failed to cite to competent evidence that could establish by a preponderance of the evidence that his pricing engine work conferred on the Bank any sort of "advantage," *Burton Imaging Grp.*, 502 F. Supp. 2d at 440.  Instead, the Court and the prospective jury has nothing more than speculation concerning this "benefit" issue (and conjecture and speculation cannot defeat a motion for summary judgment).  Once again, Sciore does not adduce anything like the revenue data cited with respect to Bell and Panto.  Although Husic was involved in the process of selecting the pricing engine and expressed her appreciation for his work on the matter shortly after it was selected (Resp., ECF No. 49-6, Sciore Decl. at ¶¶ 17, 20-21; ECF No. 49-10, Ex. D at 2), Sciore's counsel cancelled Husic's deposition (*see, e.g.*, Mot. for Summ. J., ECF No. 43-3, Ex 1) and accordingly never asked her about this process or the possible effects that selecting the pricing engine had on the Bank.  Unlike his Bickel claims, we do not even have an unsupported averment that, "upon information and belief," the pricing engine has produced profits or revenues for the Bank.  In short, a reasonable finder of fact would be forced to speculate that there must have been some sort of benefit to the Bank.  Under such circumstances, the "pricing engine" claims cannot be permitted to go to trial.

Finally, Sciore argues that, "[a]s requested by Ms. Husic on behalf of the bank, [he] also provided Defendant with the names of potential clients and investors" (including "Sciore's own father who provided Defendant with a clear line of credit and deposited approximately $200,000 in CD deposits").  (Resp., ECF No. 49-16, at 9) (citing Resp., ECF No. 49-6, Sciore Decl. at ¶¶

31-32).  He further contends that, as a result of his extensive experience in the mortgage industry, he provided "advice on various [employment and investor contracts] it was considering entering" (and offered to review an employment advertisement).  (*Id.*) (citing Resp., ECF No. 49-6, Sciore Decl. at ¶ 20; ECF No. 49-10, Ex. D).  In addition to arguing that his actions did not confer a benefit, the Bank again indicates that there is no evidence it requested Sciore's assistance and that, in any event, his claims are time-barred.  (Reply Mem., ECF No. 52, at 17-18; Def.'s Suppl. Mem., ECF No. 59, at 10-11; Def.'s Suppl. Responsive Br., ECF No. 62, at 6).  According to Sciore, "in February 2016, Defendant provided Plaintiff with an outline of its mortgage department to pave way for the discussion of elevating Defendant's business," and he then "provided his insights and advice as to how Defendant could improve its operation."  (Pl.'s Suppl. Br., ECF No. 60, at 5) (citing Resp., ECF No. 49-6, Sciore Decl. at ¶¶ 29-30; ECF No. 49-13, Ex. G; ECF No. 49-14, Ex. H).  In March and April 2016, he was "asked if Plaintiff could find contacts that were interested in purchasing Defendant's stock."  (Pl.'s Suppl. Br., ECF No. 60, at 5) (citing Resp., ECF No. 49-6, Sciore Decl. at ¶ 36; ECF No. 49-15, Ex. I).  Sciore asserts that he then continued to provide referrals and recommendations for loan officer candidates as well as assist with scheduling some of the prospective employees' interviews.  (*Id.*) (citing Pl.'s Suppl. Br., ECF No. 60-5, Ex. D).  "As such, Defendant [purportedly] enjoyed the benefit of using Plaintiff as a resource for business guidance and contact without compensating Plaintiff in any form, whereas Plaintiff provided such services that Defendant would have otherwise had to pay for had it retained a formal consultant or headhunter."  (*Id.*) (citing *Caring People All.*, 2008 WL 4441994, at *10).

Assuming arguendo that the Bank's assertions regarding untimeliness and the lack of any request on its part for assistance are without merit, the Court determines that Sciore has failed to present competent evidence indicating that his miscellaneous work actually benefited

the Bank.  Sciore merely refers in passing to business advice, investment contacts, and recruiting additional loan officers—without attempting to show (with record citations) how these activities ultimately provided an "advantage" to the Bank (Pl.'s Suppl. Br., ECF No. 60, at 5-6; Pl.'s Responsive Br., ECF No. 61, at 6-7), *Burton Imaging Grp.*, 502 F. Supp. 2d at 440. Furthermore, Sciore argues that his "efforts were considerable and targeted, resulting in Defendant hiring all three individuals (Joseph Bell, Anthony Panto, and Christopher Bickel) identified in the Motion," and he does not point to evidence that any other individual was hired by the Bank as a result of his efforts.  (Resp., ECF No. 49-16, at 7).  If recruiting these three loan officers did not confer a benefit, it follows that the Bank has not benefited from work performed "recruiting" unspecified individuals who were not hired in the first place.[5]

## V.      CONCLUSION

For the foregoing reasons, the Court grants the Bank's motion for summary judgment.

BY THE COURT:

 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge

---

[5]  Because the Court concludes that the Bank is entitled to summary judgment pursuant to the "benefit" requirement, it need not (and does not) address the parties' arguments as to whether a reasonable jury could find that the Bank accepted and retained "such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff," *MRO Corp.*, 383 F. Supp. 3d at 424 (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d at 273); *see also, e.g.*, *Shafer Elec. & Constr.* 67 A.3d at 12 n.5.

Finally, the Bank asserts that "there is a substantial basis from which to conclude that Plaintiff has initiated this action in retaliation against the Bank exercising its rights related [to] his defaulted loans."  (Mot. for Summ. J., ECF No. 43-2, Mem. of Law at 20).  Sciore's motives for filing this action are irrelevant.  In any event, summary judgment is granted because Sciore has failed to cite to competent evidence that would permit a reasonable jury to find by a preponderance of the evidence that his actions actually conferred a "benefit" on the Bank (an essential element of his claims).